## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

LIBERTY MEDIA HOLDINGS, LLC,

               Plaintiff,

      v.                             Civil Action No. 11-cv-10802-WGY

SWARM SHARING HASH FILE AE3 et al.,

               Defendants.

### PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR DEFAULT JUDGMENT AGAINST MICHAEL RAPISARDA FOR WILLFUL COPYRIGHT INFRINGEMENT

Pursuant to the Notice of Default, Fed. R. Civ. P. 55, and the Court's Standing Order, the plaintiff Liberty Media Holdings, LLC ("Liberty") respectfully requests that the Court enter a default judgment of willful copyright infringement against defendant Michael Rapisarda ("Defendant"), and award Liberty a total of $25,000.00 in statutory damages plus costs and prejudgment interest.

### BACKGROUND

#### A.  Defendant's Default

On May 6, 2011, Liberty brought the present lawsuit against 38 anonymous John Doe defendants who had used the BitTorrent file sharing protocol to illegally download and distribute Liberty's copyrighted motion picture *Down on the Farm* (the "Motion Picture").  Each of the Doe defendants in the present lawsuit were selected based on two criteria: (1) they were each caught distributing over BitTorrent the so-called AE3 Hash, which is the unique alphanumeric identifier assigned to one particular illicit copy of Plaintiff's copyrighted motion picture, and (2)

they all have Internet Protocol ("IP") addresses that are traceable with publicly available information to Massachusetts.  *See* Dinkela Decl., ¶¶ 20, 26.[1]

In its initial complaint, Liberty identified an infringer it dubbed John Doe 7, who used IP address 71.192.242.221 at 5:03:22 UTC on November 17, 2010 to illegally distribute Liberty's Motion Picture through the AE3 Swarm.  *See* Complaint ¶¶ 36–38.  Through early discovery, Liberty learned that Defendant Michael Rapisarda was the individual assigned this IP address by Comcast at the time of infringement.  *See* Silverstein Decl. ¶ 2, Ex. A.

Defendant was subsequently named in place of Doe 7 in the First Amended Complaint, filed January 23, 2012.  First Amended Complaint ("FAC") ¶¶ 18–19.  The Defendant was served with a summons and the First Amended Complaint on January 28, 2012.  *See* Return of Service, Dkt. No. 22.  Defendant did not answer, respond, or make an appearance by February 18, 2012, his deadline to do so.  Thus, the Clerk issued a default on February 27, 2012.  *See* Dkt. No. 89.  To date, Defendant has not made an appearance in the case.

## B.  By Participating in the AE3 Swarm Defendant Willfully Participated in a Collective Enterprise to Infringe Liberty's Copyright

When Defendant used the BitTorrent peer-to-peer protocol to download and distributed an infringing copy of the Motion Picture, he knowingly and willfully participated in a collective enterprise to infringe Liberty's copyright.

The BitTorrent file trading protocol has made it exceptionally easy for individuals to simultaneously download and redistribute large electronic files, such as Liberty's Motion Picture, over the internet.  BitTorrent accomplishes this by cleverly overcoming a major limitation of bandwidth by organizing all users who have or want a particular file into a "swarm," or collective distribution network.  *See* Dinkela Decl., ¶¶ 13–15.

---

[1] Declaration of Malte Dinkela, May 9, 2011 (Dkt. No. 8) ("Dinkela Decl.").

Bandwidth, which is generally measured in megabits per second ("Mbit/s"), is the speed at which files can be transferred over the internet.  Most internet users have more bandwidth devoted to downloads than they do to uploads.  For example, one common Comcast plan allows for downloads of up to 20 Mbit/s, but restricts uploads to 4 Mbit/s.  *See* Silverstein Decl., Ex. B, Comcast BLAST Internet Service.

This lower upload bandwidth is a problem for traditional peer-to-peer networks, such as Napster or Kazaa, because these services operated by, in effect, brokering a connection between one uploader with a file and one downloader who wanted that file.  The problem with this 1-to-1 connection, however, is that the file can only transfer as fast as the host can upload it.  Since our hypothetical Comcast subscriber's upload is limited to 4 Mbit/s, the downloader has 16 Mbit/s of bandwidth that goes to waste.  Moreover, if the uploader logs off or loses its connection before the transfer is complete, the downloader must start from scratch by identifying a new host who has a different digital copy of the work.  *See* Silverstein Decl., Ex. C, How Stuff Works.com, How BitTorrent Works; Ex. D, BitTorrent Explained.

To use an analogy, if traditional peer-to-peer is like a giant swap meet for trading books, then each uploader would have a stall with a copy machine in it.  When a downloader selects a book from one of these stalls, he has to wait around while the uploader copies all the pages.  And if the uploader closes shop before the copy is complete, then the downloader is out of luck.

BitTorrent overcomes this limitation by forcing all available uploaders to work collaboratively. When a file is first made available on BitTorrent, it is assigned a unique alphanumeric identifier or "hash code" and it is broken up into a number of bite-sized pieces. When a new downloader requests the file, every available uploader who has a copy of that file starts sending him different pieces, which the downloader can reassemble into the complete

work.  Thus, by working together, a swarm of 20 users, each transferring 1 Mbit/s, can maximize the 20 Mbit/s download speed of our hypothetical Comcast subscriber.  And, it doesn't matter if a particular host drops out because there are other hosts with an identical copy of the file who are able to complete the transfer.  *See* Ex. Dinkela Decl. ¶¶ 9–17; *see also* Silverstein Decl., Exs. B, C.

Moreover, BitTorrent further maximizes the available bandwidth by immediately converting downloaders into uploaders.  As soon as a downloader receives a single piece of the file, he becomes an uploader, transferring that piece to any other collaborator who needs it.  Indeed, BitTorrent actively enforces tit-for-tat by punishing "leechers," or users who do not contribute uploads.  *See* Dinkela Decl., ¶ 16; Silverstein Decl., Ex. C, p.5 (BitTorrent "uses a principal called tit-for-tat.  This means that in order to receive files, you have to give them.").

Thus, if a traditional peer-to-peer networks is like an individual stall at a marketplace, then BitTorrent is like a room full of copy machines.  When a downloader requests a book, everyone with the book, or even just part of it, starts sending him pages.  So the downloader gets 10 pages from this user, 2 pages from that user, and 5 pages from this other user, and so on, until he has collected all the pages he needs.  All the room asks is that the downloader set up his own copy machine to help shoulder the burden by redistributing the pages he has.

## ARGUMENT

## I.     THE COURT HAS JURISDICTION TO ENTER A DEFAULT

The Court has the power to issue a default judgment because Defendant is not an infant or incompetent person or in the military service of the United States.  Fed. R. Civ. P. 55(b)(2); Silverstein Decl. ¶ 12.  Moreover, the Court has both subject matter and personal jurisdiction.  The Court has subject matter jurisdiction pursuant to the Copyright Act, 17 U.S.C. §§ 101 et seq.

The Court also has personal jurisdiction over Defendant, who is a resident of Roslindale, Massachusetts, and who was served at his residential address.  *See* Return of Service, Dkt. No. 22.

## II.   LIBERTY IS ENTITILED TO A DEFAULT JUDGMENT AGAINST DEFENDANT FOR WILLFUL COPYRIGHT INFRINGEMENT

### A.  Defendant Infringed Liberty's Copyright

By defaulting, Defendant has conceded the truth of the well-pled allegations of willful copyright infringement set forth in the amended complaint.  *See Ortiz-Gonzalez v. Fonovisa*, 277 F.3d 59, 62–63 (1st Cir. 2002) ("A defaulting party is taken to have conceded the truth of the factual allegations in the complaint as establishing the grounds for liability as to which damages will be calculated.").

As such, Defendant's default establishes his liability for direct copyright infringement. Defendant has admitted that (1) Liberty is the owner of the valid and subsisting copyright in the Motion Picture, and (2) that he infringed upon Liberty's exclusive rights by making and distributing unauthorized copies of the Motion Picture by downloading and sharing the file through BitTorrent.  *See* Complaint ¶¶ 2, 18–19, 71–77; *Johnson v. Gordon*, 409 F.3d 12, 17 (1st Cir. 2005) ("To establish copyright infringement under the Copyright Act, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.").

The evidence of record likewise supports that Defendant is liable for copyright infringement.  Of record is Copyright Registration No. PA 1-698-357, which was issued by the United States Copyright Office with an effective date of August 27, 2010.  *See* Dkt No. 58-1, First Amended Complaint, Ex. A.  This copyright registration is prima facie evidence of the

validity of the copyright and the claims made therein.  *See* 17 U.S.C. § 410(c).  Defendant has not rebutted this presumption, so the copyright is valid.

The evidence of record also supports Defendant's liability for copyright infringement. On November 17, 2010, the Defendant was caught making a file bearing the AE3 Hash available for distribution over BitTorrent.  *See* Declaration of Dinkela II, ¶¶ 3–4.[2]  When the investigator requested the AE3 Hash, Defendant distributing the file to the investigator.  *See* Dinkela II, ¶ 5–6.[3]  When completed and opened, the AE3 Hash file received from Defendant was in fact an identical copy of Liberty's Motion Picture.  *See* Dinkela II, ¶ 5.  Defendant was not authorized to distribute Liberty's Motion Picture, and thus his unauthorized distribution is an infringement of Liberty's Copyright.  *See* FAC ¶¶ 54–58; 17 U.S.C. §§ 501, 106 ("anyone who violates any of the exclusive rights of the copyright owner as provided by sections 106 through 122 . . . is an infringer of the copyright," where Section 106(3) provides the exclusive right "to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending.").

The evidence of record also shows that Defendant illegally copied Liberty's Motion Picture.  Due to the architecture of BitTorrent, the fact that he possessed the AE3 Hash file necessarily means that he used BitTorrent to copy that file from other members of the swarm.

---

[2] Declaration of Malte Dinkela In Support of Plaintiff's Motion For a Default Judgment Against Michael Rapisarda for Willful Copyright Infringement (hereinafter, "Dinkela II").

[3] The fact that Liberty's investigator received the AE3 Hash from Defendant proves that Defendant had made it available for distribution.  Liberty has records that at least 991 other BitTorrent infringers downloaded the AE3 hash.  Defendant was number 250 in this swarm, with 741 infringers following him.  Indeed, he likely contributed to the downloads of no less than 4 other defendants in this suit, as Does 8 through 11 each downloaded the Motion Picture on November 17, 2010.  Thus, the evidence supports the fact that Defendant actually made infringing distributions over BitTorrent.  Defendant has not denied these allegations, and thus he is considered to have admitted them.  *See* Complaint ¶¶ 39–50 (nothing additional infringements which took place on November 17, 2010; Dinkela II, ¶ 8.

*See* Dinkela II, ¶ 8.  Liberty never authorized the distribution of the Motion Picture over

BitTorrent, and thus Defendant, like all the other infringers in the AE3 swarm, created an

infringing copy of the work.

**B.      Defendant's Infringement Was Willful**

In addition, by failing to answer, Defendant has conceded that his infringement was

"willful and intentional." *See* Complaint ¶¶ 18–19, 74–75; *Sony BMG Music Ent't. v.

Tenenbaum*, 660 F.3d 487, 508–09 (1st Cir. 2011) ("We join our sister circuits who have

unanimously and routinely found that an infringement is willful under § 504 if it is "knowing.")

*citing Yurman Design, Inc., v. PAJ, Inc.*, 262 F.3d 101, 111 (2d Cir. 2001) (finding plaintiff is

not required to show that the defendant had knowledge that its actions constituted an

infringement for infringement to be willful under § 504(c) so long as defendant recklessly

disregarded the risk of infringement.").

The circumstances surrounding the use of BitTorrent to illegally download the Motion

Picture further establishes Defendant's willfulness.  While there are legitimate uses for

BitTorrent, it is widely understood that many (or even most) of the files available over

BitTorrent are illegal copies of copyrighted works.  *See* Silverstein Decl., Ex. E, Financial Post,

p.2 ("The name of the protocol, BitTorrent, is a household name for most people under 40,

usually in connection with online file sharing and piracy").  Thus, the fact that Defendant

acquired and distributed an infringing file through BitTorrent supports that his conduct was at the

very least reckless, and more likely a knowing, calculating decision to acquire Liberty's work

without paying for it.

The willfulness of Defendant's infringement is also demonstrated by the fact that his

participation in the AE3 swarm was done for profit.  This profit is not in the form of cash

payments, but in the form of trade or barter, by giving Defendant greater access to other stolen copyrighted works.  BitTorrent clients reward users for making content available to others by enabling faster download speeds for those who share.  Users who merely download files, without publishing and sharing files, are derisively called "leechers."  Leechers are punished by the BitTorrent protocol by effectively being denied access to BitTorrent.  *See* Silverstein Decl., Ex. F ("Setting upload to '0' will get you disconnected from more and more peers . . . seeding well while downloading does improve your download."); Ex. G at p.6 ("If you're being stingy with uploads, other clients won't transfer to you.").

## III.   LIBERTY IS ENTITLED TO A PERMANENT INJUNCTION

Liberty Media respectfully requests that the Court enter a permanent injunction, in the form attached as Exhibit A to Plaintiff's Motion for Default Judgment, to enjoin Defendant from future infringements.  Section 502(a) expressly provides the Court with the power to grant injunctive relief.  *See* 17 U.S.C. § 502(a) ("Any court having jurisdiction of a civil action arising under this title may, subject to the provisions of section 1498 of title 28, grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright.").  While not automatic, a permanent injunction is warranted where there is a threat of future infringement.  *See Soc'y of the Holy Transfiguration Monastery, Inc. v. Gregory*, 780 F.Supp.2d 121, 123 (D. Mass.  2011) (Stearns, J.) ("a finding of liability for copyright infringement, combined with the threat of future infringement, justifies the imposition of a permanent injunction.").

In the present case, there is a clear threat of future infringements, which would continue the irreparable harm Defendant has already caused Liberty.  Defendant has not even deigned to make an appearance in this case, therefore there is no reason to suspect that he self-enjoin, or

voluntarily cease his infringement.  In such circumstances, courts routinely grant permanent injunctions.  *See Elektra Entertainment Group., Inc. v. Carter*, 618 F. Supp. 2d 89, 94 (entering a permanent injunction where "the possibility that future activity on a peer-to-peer network may lead to exponential infringement").

Furthermore, given the clear threat of future infringements, it is appropriate for Defendant to be enjoined from infringing not just the Motion Picture, but all of Liberty's copyrights, whether now owned or yet to be created.  *See Sony Music Entertainment, Inc. v. Global Arts Productions*, 45 F.Supp.2d 1345, 1347 (S.D. FL. 1999) (In cases with the threat of continued infringement "a district court ought not only to issue a broad permanent injunction protecting present works, but can protect works not yet created."); *Soc'y of the Holy Transfiguration*, 780 F.Supp.2d at 124 (issuing permanent injunction preventing infringement of specific works "as wells as all other current and future copyrighted works of the Monastery"); *Elektra Entertainment Group*, 618 F. Supp. 2d at 94 n.3 (collecting authority).

## IV.   LIBERTY IS ENTITLED TO AN AWARD OF STATUTORY DAMAGES IN THE AMOUNT OF $25,000.00

Due to the difficulty of estimating the actual damages Liberty suffered due to Defendant's action, Liberty hereby elects for the Court to award it statutory damages for Defendant's infringement.[4]  On the finding of infringement, the Copyright Act provides that "the copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action, with respect to any one work . . . in a sum of not less than $750.00 or more than

---

[4] Statutory Damages are available because the copyright in the Motion Picture was registered within 3 months of first publication of the work, and long before Defendant's infringement.  *See* 17 U.S.C. § 412; Copyright Registration, First Amended Complaint, Ex. A (Copyright registration with an effective date of August 27, 2010, and a date of first publication of August 26, 2010).

$30,000.00, as the court considers just."  17 U.S.C. § 504(c)(1).  Where the infringement is

willful, as it is here, "the court in its discretion may increase the award of statutory damages to a

sum of not more than $150,000."  17 U.S.C. § 504(c)(2).

Liberty need not submit any evidence of actual damages in order to recover statutory

damages under the copyright statute.[5]  Indeed, the statutory damages provision was included in

17 U.S.C. § 504 to make proof of actual damages unnecessary.  *See* 4 Nimmer § 14.04[A], at 14-

44–45 ("Under the current Act, the copyright owner may elect to recover statutory damages,

instead of actual damages and defendant's profits.  He may, moreover, make such an election

regardless of the adequacy of the evidence offered as to his actual damages and the amount of

defendant's profits, and even if he has intentionally declined to offer such evidence, although it

was available."); *Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham, Inc.*, 259

F.3d 1186, 1194 (9th Cir. 2001) ("A plaintiff may elect statutory damages regardless of the

adequacy of the evidence offered as to his actual damages and the amount of defendant's

profits).

The purpose of the statutory damages award is two-fold: to deter future infringements by

the Defendant or third parties, and to compensate Liberty for the harm caused by the

infringement.  *See F.W. Woolworth Co. v. Contemporary Arts*, 344 U.S. 228 (1952) ("The

statutory rule, formulated after long experience, not merely compels restitution of profit and

reparation for injury but also is designed to discourage wrongful conduct. The discretion of the

court is wide enough to permit a resort to statutory damages for such purposes. Even for

---

[5] However, it is clear that Defendant's activity did actually damage Liberty by
contributing to and perpetuating the rampant infringement through the AE3 Swarm.  Defendant
was number 250 of the 991 downloaders Liberty identified participating in the AE3 Swarm.
Defendant contributed to all of the infringements following his download, for a total of 741
known and recorded infringements.  The total number of infringements he contributed to is likely
higher.

uninjurious and unprofitable invasions of copyright the court may, if it deems it just, impose a liability within statutory limits to sanction and vindicate the statutory policy").

Therefore, Liberty is entitled to seek an award up to $150,000.00 for Defendant's willful infringement.  Given the particular circumstances of this case, however, Liberty believes that the award can be no less than $25,000.00 to accomplish its principal goal of deterring future infringement.

**A.  An Award of at Least $25,000.00 Is Essential to Deter BitTorrent Infringers**

Liberty requests an award of at least $25,000.00 because a stiff award of statutory damages is essential to accomplishing Liberty's principal goal of deterring future infringements of its works over BitTorrent.  For the statutory damages award to be an effective deterrent, the penalty has to be severe enough to make infringers stop thinking about the odds of being caught and start think about the financial consequences.

The practical reality is that copyright infringement is rampant over BitTorrent because there is a huge disparity between the ease of infringement and the difficulty of enforcement.  An infringing copy is made with the click of a mouse; stopping it, however, requires a federal complaint, John Doe subpoenas, hundreds of attorney hours, and a complex multi-party, multi-jurisdictional legal strategy.

Due to this practical reality, a vast number of infringements go unpunished, a fact of which BitTorrent infringers are keenly aware.  Indeed, one anonymous BitTorrent infringer estimated that the chances getting sued for copyright infringement "are about as high as you getting struck by lightning 30,000 times."  *See* Silverstein Decl., Ex. H, Yahoo Answers.  Others have calculated that the average infringer has a higher chance of "Getting killed in an accidental

injury" than they are of getting sued for copyright infringement.  *See* Silverstein Decl., Ex. I,

DigitalTrends.com, *What Is Your Chance of Getting Caught*.

Moreover, BitTorrent infringers rely on these long odds to rationalize an action that they

know to be illegal.  *See, e.g.*, Silverstein Decl., Ex. J, Techarena Forums, p.2 ("According to me,

the chances of getting caught while downloading torrents is very low.  This is because there are

many users who do such torrent downloads of games, movie and many other stuffs [sic].  This is

actually an illegal practice. As the number of users performing such downloads are very high, it

is very difficult for the particular companies to keep track on [sic] these users.  So, I guess that

there is no need to worry while doing such downloads."  Emphasis added).

Since BitTorrent infringers do not expect to be caught, for the statutory damages award to

deter, the penalty has to be severe enough to make infringers stop thinking about the odds, and

start thinking of the financial impact.  Liberty believes that any award less than $25,000.00.00

will not accomplish this goal.

Indeed, an inadequate award of statutory damages will only serve to *encourage* copyright

infringement over BitTorrent.  A BitTorrent infringer who knows that the cost of getting caught

is a slap on the wrist and a couple thousand dollars is likely to sleep easy because, even if they

are unlucky enough to be "struck by lightning 30,000 times," the likely consequences are not that

unmanageable.  *See e.g.*, Silverstein Decl., Ex. I, DigitalTrends.com ("And to the file hoarders

who amass hundreds or even thousands of pirated albums and movies, $3,000 might even look

like a bargain compared to the cost of going legit and paying for them all from the beginning.").

### B.  Deterring BitTorrent Infringement Requires a Higher Per-Work Damages Award than Prior Suits Involving Traditional Peer-To-Peer Networks

Crafting an award to deter infringement over BitTorrent differs in an important

dimension from the cases involving traditional peer-to-peer networks, such as Napster, Grokster,

and the like.  For traditional P2P cases, rights holders could see all the infringing files being offered up by a particular user, and thus, in the ensuing lawsuit, they were able to allege the infringement of multiple works by a single individual.  In certain cases, this allowed Court to accomplish the same deterrent effect with a lower per-work damages award because what was lost with price was more than made up for in volume.

The same logic does not hold true for BitTorrent, however, because the nexus of these cases is the infringing file, not the individual.  The BitTorrent protocol does not allow Liberty to see the library of works being made available by a particular individual, but rather connects the investigator to all the individuals who are offering for distribution the file associated with a particular Hash Code.  This, combined with the anonymous nature of the internet, makes it so that rights holders are generally only in the position to assert a single work at a time, as Liberty did in the present case.  Thus, in order to have the same deterrent effect, the per-work damages award has to be increased.  *See Vegas-Hernandez v. Sonolux Records*, 370 F.3d 183, 195 (1st Cir. 2004) ("The sliding scale for statutory damages is designed in part to allow courts 'to increase the amount of the award in proportion to the number of individual infringements.'  The Sliding scale is also designed to deter willful infringement.").

## IV.   LIBERTY IS ENTITLED TO COSTS AND PREJUDGMENT INTEREST[6]

Liberty respectfully requests that the Court award it $192.00 in Costs, which it incurred in bringing the present copyright suit against Defendant.  *See* Silverstein Decl. ¶ 13 (detailing costs).  Section 505 of the Copyright act expressly authorizes recovery of "full costs" because an award of costs would (1) deter future copyright infringement; (2) ensure that all holders of copyrights which have been infringed will have equal access to the court to protect their works;

---

[6] Liberty notes that it is also entitled to a reasonable attorneys' fee pursuant to 17 U.S.C. § 505.  Should the court grant the requested statutory damages, however, Liberty will not seek attorneys' fees

and (3) penalize the losing party and compensate the prevailing party." *A&N Music Corp. v. Venezia*, 773 F. Supp. 955, 959 (E.D. Penn. 1990) (awarding costs on default judgment in copyright infringement action) (citations omitted).

The Court should also award Liberty prejudgment interest. *See TMTV, Corp. v. Mass Productions, Inc.*, 645 F.3d 464, 474 (1st Cir. 2011) (holding that an award of prejudgment interest in copyright cases is a matter of "informed discretion of the court"). In cases sounding in tort, including copyright infringement, M.G.L c. 231 § 6B provides for an interest rate of 12% per annum from the date of commencement of the action. This action was commenced on May 6, 2011, so the period of time from commencement to March 28, 2012 (327 days) is 327 days, for an interest award of 2,690.00.

Dated: March 28, 2012

Respectfully submitted,

LIBERTY MEDIA HOLDINGS, LLC

By its attorneys,

/s/Aaron Silverstein
Aaron Silverstein, Esq.
(BBO #660716)
SAUNDERS & SILVERSTEIN LLP
14 Cedar Street, Suite 224
Amesbury, MA 01913
P: 978-463-9100
F: 978-463-9109
E: asilverstein@massiplaw.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 28, 2012, the foregoing document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing, and paper copies will be served via first-class mail to those indicated as non-registered participants.

/s/Aaron Silverstein